***********
Based upon the competent evidence of record with reference to the errors assigned and in accordance with the directives of the North Carolina Court of Appeals, the Full Commission, enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant hereto, with defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer at all times relevant hereto.
3. Plaintiff sustained a compensable injury by accident on 28 August 2001.
4. RSKCO was the carrier on the risk at all times relevant to this proceeding.
5. Plaintiff's average weekly wage on 28 August 2001 was $1009.42, which yields the maximum compensation rate for 2001 of $620.00.
6. At and subsequent to the hearing, the parties submitted the following: (a) a packet of medical records; (b) plaintiff's personnel file; and (c) Industrial Commission documents.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was fifty-one (51) years of age. Plaintiff is a high school graduate and is certified in floral design.
2. Plaintiff began her employment with defendant-employer in approximately 1988, as a material handler/receiving technician. In that capacity, plaintiff was responsible for receiving potatoes from deliverers and sampling potatoes for quality control. Her duties included unloading potatoes from delivery trucks using a hydraulic machine, weighing samples of *Page 3 
potatoes in buckets and sorting potatoes in bins according to size and quality. Plaintiff was also required to clean and sweep the area where the potatoes were unloaded.
3. On 28 August 2001, plaintiff sustained an admittedly compensable injury by accident when she fell while climbing a ladder toward a raised platform that was seven (7) to twelve (12) feet off the ground. As plaintiff reached the top of the ladder and was attempting to pull herself up, her hand slipped and she fell, sliding down the ladder to the concrete floor. As a result of her fall, plaintiff sustained a hairline fracture to the radial head of her right elbow, contusions to her right hip, wrist, hand, arm, shoulder and back. She also suffered from pain to both lower extremities. Defendants have stipulated to the compensability of this accident, and began paying plaintiff temporary total disability compensation.
4. Following the accident, plaintiff was transported by ambulance to the emergency room at Carolinas Medical Center where she underwent a series of x-rays. An x-ray of plaintiff's chest and pelvis revealed no abnormalities. X-rays of plaintiff's right hand, right shoulder and lumbar spine revealed degenerative changes. An x-ray of plaintiff's right elbow revealed a fracture of the radial head with possible tensile ligamentous injury to the medial collateral ligament. An x-ray of her right forearm also revealed a fracture. Plaintiff was treated at the hospital and released with a referral to Dr. David DuPuy, an orthopedic surgeon.
5. Dr. DuPuy initially saw plaintiff on 30 August 2001. Following an examination, Dr. DuPuy determined that plaintiff had normal reflexes, no weakness in the lower extremities, no sciatic nerve involvement and there was no evidence of neurological damage. Additionally, Dr. DuPuy noted that plaintiff had no headache or neck pain, a normal cranial nerve exam, and normal reflexes. Dr. DuPuy diagnosed plaintiff with a right elbow radial head fracture, a neck sprain and contusions to her back, right hip, and right knee. Plaintiff was prescribed *Page 4 
medications, given a right arm sling and advised to begin a range of motion physical therapy program. Additionally, Dr. DuPuy removed plaintiff from work for two (2) weeks.
6. On 10 September 2001, plaintiff returned to Dr. DuPuy complaining of pain in her hip, and of her elbow's slow recovery. Dr. DuPuy's examination revealed pain along plaintiff's medial joint line of the right knee with a slight effusion. Dr. DuPuy diagnosed plaintiff with a radial head fracture of the right elbow, a bruised back, a bruised right hip, a neck sprain and a right knee sprain. With these symptoms and additional diagnoses, Dr. DuPuy continued to medically excuse plaintiff from work. He saw plaintiff again on 24 September 2001, at which time she reported continued hip pain. He continued to excuse plaintiff from work.
7. On 8 October 2001, plaintiff reported to Dr. DuPuy that her elbow was much improved and that she had an excellent range of motion, with minimal discomfort of the right hip. Dr. DuPuy released plaintiff to return to restricted, light-duty work as of 9 October 2001. Plaintiff's restrictions included no lifting more than ten (10) pounds, no pushing or pulling greater than twenty-five (25) pounds, no prolonged bending, stooping, squatting, or kneeling, and no lifting above shoulder level. Additionally, Dr. DuPuy indicated that plaintiff should not stand or walk longer than twenty (20) minutes per hour.
8. In October 2001, plaintiff returned to work for defendant-employer in a modified job, performing administrative and sanitation duties that were within the restrictions assigned by Dr. DuPuy. While working in the modified job, plaintiff reportedly began to experience increased pain and feelings of frustration, depression and anxiety. Plaintiff testified that she believed she could not physically perform her duties even with the modifications. *Page 5 
9. On 4 December 2001, plaintiff reported to Dr. DuPuy that she was experiencing right knee and ankle pain while walking through defendant-employer's facility in the performance of her sanitation duties. Dr. DuPuy noted that plaintiff had not had prior complaints of knee pain "until this episode" and he increased plaintiff's lifting allowance to twenty (20) pounds and her pulling or pushing allowance to sixty (60) pounds.
10. Plaintiff testified that during the period of October 2001 to December 2001, she received mixed messages from her physicians regarding her physical limitations, and that defendant-employer had unrealistic expectations as to her abilities. In the modified position, plaintiff was permitted to place fewer potatoes in her buckets so her load would be lighter, and she was given a cart with which to push the bucket. Additionally, defendant-employer lowered a lever so that plaintiff would not have to lift her arms overhead. Despite these accommodations, plaintiff continued to experience pain.
11. On 8 January 2002, plaintiff returned to Dr. DuPuy, reporting pain in her right upper extremity that was making it difficult for her to work. Plaintiff also reported decreased strength and requested a referral to a neurologist. Dr. DuPuy denied plaintiff's request for a referral to a neurologist, and instead increased her pulling-pushing restriction from sixty (60) to one hundred (100) pounds. Based upon the stipulated employment records, plaintiff went out of work on short-term disability from 21 January 2002 until 15 April 2002.
12. Plaintiff returned to Dr. DuPuy on 5 February 2002, with ongoing complaints of pain and significant emotional problems. At that time, plaintiff had not worked for defendant-employer for approximately two weeks. Dr. DuPuy recommended that she continue to work. Dr. Dupuy was of the opinion that plaintiff had an extreme subjective, emotional overlay and referred her for a functional capacity evaluation (FCE). *Page 6 
13. On 22 February 2002, plaintiff underwent the FCE ordered by Dr. DuPuy. The results indicated that plaintiff was capable of performing light-duty work with frequent floor to knuckle lifting of twelve (12) pounds, knuckle to shoulder lifting of nine (9) pounds, shoulder to overhead lifting of six (6) pounds, and a carrying limit of ten (10) pounds for fifty (50) feet with pivoting. The results also indicated that plaintiff gave consistent effort throughout the examination. On 7 March 2002, after reviewing the FCE results and a description of plaintiff's usual job, Dr. DuPuy opined that plaintiff was able to continue performing the light-duty potato receiver position.
14. Just prior to her FCE, plaintiff sought psychological treatment on 12 February 2002, from Dr. Kenneth Carter and Ms. Susan Vigeant of Rock Hill Psychiatric Consultants. Ms. Vigeant is a nurse practitioner who counseled plaintiff under the supervision of Dr. Carter. During the 12 February 2002 appointment with Ms. Vigeant plaintiff reported being depressed and expressed a desire to return to her normal self. Plaintiff further reported that her depression began when she began to feel powerless in obtaining what she viewed as proper medical treatment for her work-related injury.
15. Based upon plaintiff's history and counseling sessions, Ms. Vigeant opined that plaintiff's psychiatric symptoms were caused by the loss of her usual level of functioning and uncertainty about her status at work. Ms. Vigeant diagnosed plaintiff with severe depressive disorder and panic disorder, for which plaintiff was prescribed Wellbutrin, Serzone, Sonata, and Klonopin.
16. Dr. Carter testified that plaintiff suffers from anxiety relating to her inability to support herself, and also diagnosed plaintiff with major depression and panic disorder. Dr. Carter opined that although she has other stressors in her life, plaintiff's psychiatric symptoms *Page 7 
were causally related to her 28 August 2001 injury by accident. Additionally, Dr. Carter opined that plaintiff was not capable of returning to work due to her impaired concentration and focus; but he deferred to plaintiff's orthopedic specialist on what plaintiff's physical limitations were.
17. On 7 March 2002, plaintiff returned to Dr. DuPuy and reported experiencing ongoing pain in her shoulders and arms. In his notes from that date, Dr. DuPuy wrote that plaintiff was just "rambling on and on" about how he did not understand her pain. It was Dr. DuPuy's opinion that plaintiff continued to be able to work with restrictions in the modified job provided by defendant-employer. Plaintiff returned to work after a leave of absence on 15 April 2002.
18. In June 2002, plaintiff served on jury duty. When that service concluded, plaintiff contacted defendant-employer regarding her return to work and was informed not to return until she was no longer under any restrictions.
19. On 9 July 2002, upon an Order by the Commission, plaintiff was examined by Dr. Neal Taub, a medical specialist in the field of physical medicine and rehabilitation. Based upon his initial examination, Dr. Taub found that plaintiff had persistent right shoulder, hip and knee pain with probable myofascial pain syndrome. Dr. Taub testified that plaintiff's musculoskeletal problems, including the pain in her back, knee, hip, arm, and shoulder are related to her 28 August 2001 injury by accident. Dr. Taub further opined that: (a) plaintiff was capable of working within the restrictions outlined in the FCE; (b) plaintiff needed additional physical therapy; and (c) plaintiff had not reached maximum medical improvement.
20. As of 12 August 2002, Dr. DuPuy released plaintiff to return to her full duties in her former position with defendant-employer. Dr. DuPuy opined that plaintiff reached maximum *Page 8 
medical improvement on 5 February 2002, with a fifteen percent (15%) permanent partial disability rating to her right arm, and no permanent impairment to any other body part.
21. On 10 January 2003, Dr. Taub prescribed physical and aquatic therapy for plaintiff, which improved her symptoms. Additionally, Dr. Taub prescribed the use of a TENS unit, which also improved plaintiff's symptoms. Dr. Taub testified that plaintiff would continue to experience chronic pain requiring medication or other treatment.
22. Dr. DuPuy opined that plaintiff's psychological symptoms and her physical conditions, except the hairline fracture of the right elbow radial head and some initial right hip, arm, and back bruising, were not caused by, aggravated by, or related to plaintiff's injury by accident of 28 August 2001.
23. Dr. Taub did not address plaintiff's alleged mental problems in his deposition.
24. Based on the greater weight of the evidence, plaintiff has lost confidence in Dr. DuPuy as her treating physician. Additionally, the evidence shows that plaintiff's conditions and symptoms have improved under the treatment regime provided by Dr. Taub, whose designation as plaintiff's authorized treating physician is approved by the Full Commission.
25. The opinions of Dr. DuPuy on plaintiff's work restrictions and ability to work are given less weight than the opinions of plaintiff's newly designated treating physician, Dr. Taub. Dr. DuPuy's opinion that plaintiff had no restrictions as of 12 August 2002, is contrary to the FCE he ordered, and Dr. DuPuy's testimony that certain symptoms, such as plaintiff's knee pain, were not related to her fall contradicts his medical records.
26. Based upon the greater weight of the evidence, plaintiff's musculoskeletal problems, including pain in her back, knee, hip, arm, and shoulder are causally related to and the direct and natural result of her 28 August 2001 injury by accident. *Page 9 
27. Based upon the greater weight of the evidence, plaintiff's need for treatment for her psychological problems was not a direct and natural result of conditions related to her compensable injury. Dr. DuPuy testified that plaintiff's diagnoses of depression, anxiety, and panic disorder were not related to her compensable injury. The opinions of Dr. Carter and Ms. Vigeant are unpersuasive and provide insufficient proof that plaintiff's job duties or her compensable injury caused her psychological symptoms, or that her psychological problems were a direct and natural consequence of her compensable injury.
28. Although the duties of the light-duty administrative and sanitation position to which plaintiff was assigned upon her return to work in October 2001, may have been performed by a number of employees as part of their regular positions, there is no evidence of record that the duties as modified for plaintiff constituted a regular job filled by any employee working for defendant-employer, or that such a position exists in the competitive job market. Additionally, there is insufficient evidence from which to find that the modified version of the Receiving Technician job which Dr. Dupuy opined plaintiff could do was available to plaintiff or any other employee at any time after June 2002. Moreover, defendants did not offer plaintiff any job after her June 2002 jury duty even though she contacted defendant-employer about returning to work following completion of her jury duty obligations.
29. There is insufficient evidence in the record from which to determine whether there existed suitable employment available to plaintiff after June 2002, or whether plaintiff made reasonable efforts to secure suitable employment.
30. As a result of her 28 August 2001 injury by accident to her back, right knee, right hip, right arm, right shoulder and related conditions, plaintiff has been unable to earn wages in any position with defendant-employer or in any other employment for the period from 28 August *Page 10 
2001 to 9 October 2001. Thereafter plaintiff's assigned duties did not establish wage-earning capacity, although she did work during varying periods until June 2002. As of July 2002, both Dr. Taub and Dr. Dupuy were of the opinion that plaintiff was capable of working, but Dr. Taub limited plaintiff to the restrictions identified on the FCE and felt that plaintiff had not reached maximum medical improvement.
31. There is insufficient evidence in the record from which to determine plaintiff's disability after 9 July 2002, although Dr. Taub continued to provide treatment after that date.
32. Regarding safety provisions at the site of plaintiff's 28 August 2001 injury by accident, the platform in question did not have side railings or other types of protective guarding. According to plaintiff's testimony, she was not provided a safety belt to use while on the ladder and platform. Plaintiff contends that the lack of a side rail or harness caused her to lose her balance and fall. However, the greater weight of the evidence does not establish that defendant-employer failed to comply with any statutory requirement. North Carolina OSHA Standard requires that platforms must have railings "except where there is an entrance to a ramp, stairway, or fixed ladder." 29 C.F.R. § 1910.23; N.C. Gen. Stat § 95-131 (adopting federal standards). 13 N.C. Admin. Code 07F.0404 (e)(1), only requires safety belts or harnesses where employees are "exposed to platforms that do not meet the requirements of 29 C.F.R. § 1910.23." Plaintiff was still on the ladder in front of the ladder entrance at the time she fell. The ladder entrance complied with29 C.F.R. § 1910.23. Thus, no statute required a railing or harness at the location where plaintiff fell. Furthermore, a railing on the platform would not have prevented the fall that plaintiff suffered.
33. Defendants' actions in this matter were reasonable and not indicative of stubborn, unfounded litigiousness. *Page 11 
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 28 October 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Because the compensability of plaintiff's original injury is not in dispute, defendants have the burden of proving that plaintiff's musculoskeletal problems, including pain in her back, knee, hip, arm, and shoulder are not the result of, or causally related to her original injury by accident. Parsons v. Pantry, Inc., 126 N.C. App. 540,485 S.E.2d 867 (1997). Based on the greater weight of the evidence, defendants have not met this burden. Based on the greater weight of the evidence, plaintiff's musculoskeletal problems, including pain in her back, right knee, right hip, right arm, and right shoulder are causally related to and the direct and natural result of her 28 August 2001 injury by accident. N.C. Gen. Stat. § 97-2(6).
3. There is insufficient evidence in the record from which to determine whether suitable employment was available to plaintiff after July 2002, or whether plaintiff made reasonable efforts to secure suitable employment. In order to receive disability compensation, the employee has the burden of proving the existence of that disability and its extent. Perkins v. U.S. Airways, 177 N.C. App. 205, 628 S.E.2d 402
(2006). The burden may be met in one of four ways: (1) the production of medical evidence that she is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of *Page 12 
evidence that she is capable of some work, but that she has, after a reasonable effort on her part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that she is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment[; ] or (4) the production of evidence that she has obtained other employment at a wage less than that earned prior to the injury. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993). In the instant case, plaintiff was medically excused from work following her injury by accident until 9 October 2001. Thereafter, defendant-employer provided plaintiff with modified job duties. Although the duties of the light-duty administrative and sanitation position to which plaintiff was assigned upon her return to work in October 2001, may have been performed by a number of employees as part of their regular positions, there is no evidence of record that the duties as modified for plaintiff constituted a regular job filled by any employee working for defendant-employer, or that such a position exists in the competitive job market. Additionally, there is insufficient evidence from which to find that the modified version of the Receiving Technician job which Dr. Dupuy opined plaintiff could do was available to plaintiff or any other employee at any time after June 2002. Moreover, defendants did not offer plaintiff any job after her June 2002 jury duty even though she contacted defendant-employer about returning to work following completion of her jury duty obligations. However, plaintiff has the burden of proving disability, and plaintiff has not shown she made reasonable efforts to secure suitable employment or that seeking suitable employment would be futile or that due to her injury she has obtained employment earning less than pre-injury wages.
4. As a result of her 28 August 2001 injury by accident and related conditions, plaintiff is entitled to be paid by defendants total disability compensation at the rate of $620.00 per week from 28 August 2001 through 9 July 2002, when Dr. Taub opined she could do light-duty work. N.C. Gen. Stat. § 97-29. Plaintiff is entitled to permanent partial disability *Page 13 
compensation at the rate of $620.00 for a period of 36 weeks for the fifteen percent (15%) rating to her right arm. N.C. Gen Stat. § 97-31
(13).
5. Plaintiff is entitled to the payment of medical expenses incurred or to be incurred for the treatment of the injury to her back, right knee, right hip, right arm, and right shoulder related to her injury so long as such treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
6. Plaintiff is not entitled to an additional ten percent (10%) added to her benefits pursuant to N.C. Gen. Stat. § 97-12.
7. Because defendants' actions in this matter were reasonable and were not indicative of stubborn, unfounded litigiousness, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay to plaintiff total disability compensation at the rate of $620.00 per week for the period of 28 August 2001 through 9 July 2002. Plaintiff is also entitled to permanent partial disability compensation at the rate of $620.00 for a period of 36 weeks for the fifteen percent (15%) rating to her right arm. Defendants are entitled to a credit for wages plaintiff earned during the periods she returned to a modified, make-work job and for any overpayment of temporary total disability compensation plaintiff has received.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff in the future, for the treatment of her back, right knee, right hip, right arm, and right *Page 14 
shoulder so long as such treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff herein is approved for counsel for plaintiff. This fee shall be deducted from the amounts due plaintiff.
4. Defendants shall pay the costs, including any remaining unpaid expert witness fees.
5. Dr. Neal Taub is approved as plaintiff's authorized treating physician.
This the __ day of August 2007.
S/________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/________________________ DANNY LEE McDONALD COMMISSIONER
 S/________________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1